UNITED STATES, Appellee,

v.

Sergeant Gerald P. IVEY, United
States Army, Appellant.

ARMY 9700810.

U.S. Army Court of Criminal Appeals.

16 June 2000.

For Appellant: Captain Stephanie L. Haines, JA (argued); Colonel John T. Phelps II, JA; Colonel Adele H. Odegard, JA; Major Kirsten V.C. Brunson, JA; Captain Jodi E. Terwilliger–Stacey, JA (on brief).

For Appellee: Captain Paul T. Cygnarowicz, JA (argued); Colonel Russell S. Estey, JA; Lieutenant Colonel Eugene R. Milhizer, JA; Captain Joseph A. Pixley, JA (on brief); Major Patricia A. Ham, JA.

Before CAIRNS, Senior Judge, BROWN, and VOWELL, Appellate Military Judges.

## OPINION OF THE COURT

VOWELL, Judge:

Contrary to his pleas, the appellant was convicted at a general court-martial of conspiracy to possess marijuana with intent to distribute (one specification), conspiracy to

possess marijuana and cocaine with intent to distribute (one specification),[1] possession of an unregistered rifle in violation of a Fort Carson regulation, possession of marijuana with intent to distribute (two specifications), possession of cocaine with intent to distribute (one specification), and illegal purchases and transfers of firearms (nine specifications),[2] in violation of Articles 81, 92, 112a, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 892, 912a, and 934 [hereinafter UCMJ]. The officer and enlisted members sentenced the appellant to a dishonorable discharge, confinement for fifteen years, forfeiture of all pay and allowances, and reduction to Private E1. The convening authority approved the adjudged sentence and ordered 185 days of pretrial confinement credit against the confinement adjudged.

In this Article 66, UCMJ, 10 U.S.C. § 866, appeal, the appellant contends that the government's failure to process requests for immunity for the appellant's civilian co-conspirators violated his rights to due process and that the military judge's refusal to abate or otherwise delay the proceedings until immunity was granted violated his right to present a defense. He also challenges the legal and factual sufficiency of three specifications of purchasing firearms in violation of 18 U.S.C. § 922(a)(6)[3] and argues that the military judge improperly instructed the court members on a mistake of fact defense with regard to these specifications. Finally, he argues that his sentence is inappropriately severe, particularly as compared to those of his co-conspirators. We find that the evidence pertaining to one of the firearms purchase specifications is not factually sufficient, but find no other errors prejudicial to the substantial rights of the appellant.

1. The court-martial promulgating order erroneously reflects that the appellant was convicted of conspiracy to distribute marijuana (Specifications 1 and 2 of Charge II), rather than conspiracy to possess marijuana with the intent to distribute (Specification 1) and conspiracy to possess marijuana and cocaine with an intent to distribute (Specification 2). We will issue a correcting certificate.

2. These included four specifications of transferring firearms in connection with drug trafficking, in violation of 18 U.S.C. § 924(h) (1998); three specifications of making a false and fictitious statement to a firearms dealer in connection with

## BACKGROUND

### I. The Offenses

### A. The February 1996 Drug Offenses

The appellant and his brother, James, grew up in Gary, Indiana (Gary). Several of the appellant's boyhood friends, Doug Parrett, and brothers Frank and Deon McFadden, were members of the Gangster Disciples, a nationwide gang that originated in the Chicago, Illinois, area. The appellant and a local friend, Darryl Washington, were high-ranking members of a Gangster Disciples chapter in Colorado Springs, Colorado. Unknown to the appellant, Darryl Washington was also an informant for the Bureau of Alcohol, Tobacco, and Firearms (ATF), Department of the Treasury.

Mr. Parrett and the McFadden brothers had become involved in cocaine trafficking in the Gary area. Competition in the cocaine trade there and the criminal penalties associated with cocaine distribution led Mr. Parrett and the McFadden brothers to become interested in marijuana distribution. The appellant offered to assist them in this diversification of their criminal activity.

During a trip back to Gary in early 1996, the appellant and Darryl Washington met with the McFadden brothers and Doug Parrett. At the meeting, the appellant indicated that another Fort Carson soldier, Private First Class (PFC) Alfonso Murray, had bragged about his ability to obtain large quantities of marijuana in El Paso, Texas (El Paso), where he had formerly been stationed. Although PFC Murray later became an in-

a firearms sale, in violation of 18 U.S.C. § 922(a)(6) (1998); and two specifications of delivering a firearm to a nonresident of Colorado, in violation of 18 U.S.C. § 922(a)(5) (1998).

3. Specifically, the appellant challenges his conviction of Specifications 2, 7, and 10 of Charge IV, which alleged that the appellant gave false and fictitious written statements in connection with the acquisition of certain firearms on 12 March 1996 (Specification 2), 13 March 1996 (Specification 7), and 8 April 1996 (Specification 10).

formant for the ATF, at this point he was not working for law enforcement personnel.

In February 1996, James Ivey (the appellant's brother) and Deon McFadden came to Colorado Springs, where they stayed with the appellant. The appellant introduced them to PFC Murray, who agreed to set them up with his source of marijuana in El Paso. Due to military duties, PFC Murray was unable to go with the group to El Paso, but he secured the services of another soldier familiar with the area, Private (PVT) Kim Rush, to accompany the Gary group on the trip. The appellant, who did not go to El Paso with the others, lent his brother his truck and a shotgun for the trip.

While in El Paso, the group eventually secured what they believed to be about forty pounds of marijuana. They arranged for one of the group members to return with the drugs by bus to Colorado Springs, while the remainder returned in the appellant's truck and in another vehicle belonging to PFC Murray that they had picked up for Murray from an El Paso repair shop.

Upon their return to Colorado, the group divided and packaged the marijuana at the appellant's house, with the appellant receiving a small portion of the marijuana. Private Rush, who expected some compensation for making the trip, had no luck getting the Gary crowd to pay him. He testified that the appellant finally gave him $250.00 in cash for making the trip.

The February 1996 trip was the basis for the appellant's conviction of conspiracy to possess marijuana with the intent to distribute it; and transfer of a firearm with knowledge that it would be used in drug trafficking, in violation of 18 U.S.C. § 924(h).

Doug Parrett and the McFadden brothers returned to Colorado Springs in March 1996 because they discovered the marijuana they had purchased was substantially short of the forty pounds for which they had paid. The appellant contacted PFC Murray and arranged a meeting between PFC Murray and the Gary gang members. The meeting was not cordial, and PFC Murray later credited the appellant with saving him from being choked by Deon McFadden. Eventually, with the confrontation defused, PFC Murray and the Gary group made plans for another trip to El Paso.

## B. The March 1996 Firearms Purchases

Prior to the March trip to El Paso, the appellant took Doug Parrett, Deon McFadden, and Frank McFadden with him to a local gun shop, Dragon Arms, operated by Mr. Mel Bernstein. As Indiana residents, none of the Gary gang members could legally purchase a handgun in Colorado. As a soldier stationed in the state, however, the appellant could. After the group spent over an hour in the store examining and test-firing various handguns, the appellant completed the purchase of three handguns (two of the same model) with money provided by the other three. He used a copy of his military orders along with his military identification card to establish Colorado residency for purposes of the purchase.

Mr. Bernstein assisted the appellant in the purchase of the handguns. He allowed the McFadden brothers and Mr. Parrett to shoot weapons they could not lawfully purchase in Colorado and observed them either passing money to the appellant or placing it on the counter when it came time to pay for the handguns. While the appellant was completing the ATF Form 4473, in which the appellant ·asserted he was the "actual buyer" of the three handguns, Mr. Bernstein told the appellant that he could resell the weapons after he left the store. Mr. Bernstein also explained to the appellant how to transfer ownership on the gun registration documents. Later, in his confession to the ATF, the appellant admitted that his three friends from Gary actually purchased the weapons.

The purchase of weapons for another is referred to as a "straw purchase" and, under most circumstances, is a violation of 18 U.S.C. § 922(a)(6). Mr. Bernstein's testimony indicated he was very familiar with the prohibitions against a straw purchase. This transaction formed the basis for Specification 2 of Charge IV.

Darryl Washington learned of the 12 March 1996 gun sales at Dragon Arms, and promptly reported them to his contact at the ATF. The ATF contact asked Mr. Washington to arrange to have the appellant make a

gun purchase.[4] Mr. Washington's subsequent conversation with the appellant was recorded, and the tape, which was introduced at trial, reflects the appellant's ready agreement to make a gun purchase for Mr. Washington.

The appellant returned to Dragon Arms on 13 March 1996 with Mr. Washington. While an ATF agent posed as the gun salesman, Mr. Washington selected a weapon. The appellant then completed the ATF Form 4473, certifying that he was the actual buyer. Mr. Washington took possession of the handgun when they left the store and later turned it over to ATF agents. This transaction was the basis for Specification 7 of Charge IV.

### C. The April 1996 Drug and Firearms Offenses

Deon McFadden and Doug Parrett returned to Colorado Springs for another drug transaction in April 1996. The appellant picked them up at the airport and participated in their discussions with PFC Murray about obtaining another large quantity of marijuana. However, by this time PFC Murray had already been arrested on drug charges and had become an informant for the ATF. His ATF contacts were concerned about the surveillance difficulties inherent in a trip from Colorado Springs to El Paso. Therefore, they instructed him to pretend he had a source in Colorado.

Prior to making the trip to pick up the drugs, the appellant, Doug Parrett, and Deon McFadden returned to Dragon Arms for more firearms. The ATF was tipped off about the intended purchase and, once again, had an agent present in the store on 8 April 1996 when the appellant purchased three Intratec 9mm pistols, including two of the same model, and a rifle. Ms. Terry Flanell, who was aware that ATF agents were scrutinizing the appellant's purchase, made the actual sale. She testified that she wanted to warn the appellant, but was concerned about obstructing justice. During the transaction, she made an oblique attempt to warn the appellant, telling him she hoped he wasn't "buying these guns for anybody else," and

cautioning him about being involved with gangs like the Gangster Disciples. The appellant assured her he was not. This purchase formed the basis for Specification 10 of Charge IV.

On 11 April 1996, in a two-vehicle convoy led by PFC Murray, the appellant, James Ivey, Doug Parrett, and Deon McFadden traveled from Colorado Springs toward Trinidad, Colorado. Along the way, PFC Murray became aware that the group from Gary had not brought any money with which to purchase the drugs. Fearful that they intended to rob or injure the drug suppliers (who were actually federal agents), PFC Murray called off the convoy, and made arrangements to pick up and deliver the drugs himself.

In a taped telephone call between PFC Murray and the appellant later that day, PFC Murray announced that he had obtained not only the fifty pounds of marijuana the appellant and his friends had sought, but had been able to obtain a kilogram of cocaine as well. The appellant instructed PFC Murray where to drop the drugs at his home. En route back to his house, federal agents arrested the appellant and his cohorts.

### II. Federal Prosecution of Co–Conspirators

Doug Parrett and Deon McFadden entered guilty pleas in federal district court to the 11 April 1996 conspiracy to possess marijuana with intent to distribute it. James Ivey and Frank McFadden pled guilty to the 29 February 1996 conspiracy to possess marijuana with intent to distribute it. Pursuant to their guilty pleas, other charged offenses were dismissed. Frank McFadden, Deon McFadden, and James Ivey were sentenced on 8 July 1997; and Doug Parrett was sentenced on 4 August 1997. Their sentences ranged from thirteen months to five years of confinement, with an additional period of supervised release after completion of the confinement.

### III. The Appellant's Trial

### A. Immunity Request

On Friday, 9 May 1997, four days before the appellant's trial was scheduled to begin,

---

4. Darryl Washington testified that he was 20 years old at the time, and thus could not lawfully

purchase a handgun.

the appellant formally requested that the convening authority grant testimonial immunity to four civilian witnesses: James Ivey, Doug Parrett, Deon McFadden, and Frank McFadden. The immunity request asserted that the four were material witnesses with information crucial to the appellant's defense, and that they would invoke their rights against self-incrimination if called to testify without immunity. The request was vague, however, on the specific testimony each would provide.

The appellant's civilian defense counsel asserted that he had talked with James Ivey and that James Ivey would deny his brother's involvement in both of the charged conspiracies to possess illegal drugs. The civilian defense counsel provided no further details of James Ivey's expected testimony. The immunity request was even less specific about the expected testimony of the other three witnesses, alleging that: Deon McFadden's attorney had said that his client had favorable information about the appellant; "other sources" indicated Frank McFadden would testify that the appellant was not part of the conspiracy and did not own the rifle described in Specification 3 of Charge II; and "other sources" indicated Doug Parrett would also deny that the appellant was part of the conspiracy.

The request for immunity also asserted that the government had gained a tactical advantage by offering immunity to a government witness, PFC Murray, and granting leniency to PVT Rush. The defense counsel contended that scheduling the appellant's trial date before the requested witnesses were sentenced deprived the appellant of his ability to present a defense.

Also on 9 May 1997, the detailed defense counsel requested that the military judge abate the proceedings until immunity was granted. On that same date, the detailed defense counsel requested a continuance, asserting that additional trial preparation time was required because of the immunity request, notice of additional government witnesses, and the government's failure to make a confidential source, Darryl Washington, available for interview.

The immunity request was litigated in an Article 39(a), UCMJ, session on 12 May 1997. As an additional proffer of the exculpatory evidence the witnesses were expected to provide, the civilian defense counsel asserted that the appellant's mother had spoken with Doug Parrett, who assured her that her son was not part of the conspiracy alleged. He argued that the testimony of each of the witnesses requested was clearly exculpatory and not cumulative.

At the time of this Article 39(a), UCMJ, session, the staff judge advocate had not yet taken the request for immunity to the convening authority. The trial counsel conceded that each of the witnesses would invoke his right to remain silent if called and asserted that the local Assistant United States Attorney (AUSA), who was prosecuting the requested witnesses, was opposed to any grant of immunity for them. She noted that, as the convening authority had no power to grant immunity to civilian witnesses, the request would have to be forwarded to the Office of The Judge Advocate General (OTJAG) for coordination with the Department of Justice. In view of the late date of the immunity request and the opposition of the local AUSA to granting immunity, the request had not been forwarded to OTJAG.

Although the convening authority had not yet acted on the defense immunity request at the time of the Article 39(a), UCMJ, session, the military judge treated the failure to act as a denial of the request.[5] While neither counsel objected, Rule for Courts–Martial 704(e) [hereinafter R.C.M.] provides that a judge may act on a motion for appropriate relief *after* the convening authority has denied a defense request for immunity. The military judge nonetheless ruled that he would not abate the proceedings.

At trial, none of the four witnesses for whom the defense sought immunity testified. Post-trial, the defense submitted an affidavit

---

5. The convening authority did not formally act until after the defense renewed its request post-trial, on 19 August 1997. On 10 September 1997, the convening authority denied the request for immunity. The defense asserted in the Rule for Courts–Martial 1106 submissions that the failure to grant the request for immunity at trial was a legal error.

of James Ivey, the appellant's brother, detailing what his testimony would have been. In addition, the defense submitted the stipulations of fact used in sentencing Doug Parrett, Deon McFadden, Frank McFadden, and James Ivey in their federal district court trials as part of the appellant's R.C.M. 1105 and 1106 submissions.

Both PVT Rush and now-PVT Murray testified at the appellant's trial after their own courts-martial for their part in the drug transactions. Private Rush's sentence had been approved at the time of his testimony. He testified without a grant of immunity or promise of leniency.[6]

Private Murray testified for the prosecution under a grant of immunity. However, after his testimony was frequently favorable to the appellant, the military judge declared him a hostile witness, pursuant to the trial counsel's request.

### B. Instructions

The civilian defense counsel requested an ignorance or mistake of fact instruction with regard to the 12 March 1996 firearms purchase (Specification 2 of Charge IV). Although he termed his request as one for a mistake of fact instruction, the discussion surrounding the request suggests that his focus was on the appellant's lack of criminal intent as a result of his ignorance of the legal significance of completing ATF Form 4473 indicating that he was the actual purchaser of the four firearms. As the civilian defense counsel argued: "I think ignorance of fact exists as to whether he knew that by filling out that form in the method that he did he

was violating a federal law." The military judge took the request under advisement.

After a short recess, the military judge indicated that he would "give a mistake instruction in the nature of an ignorance instruction as to the [Article] 134 offenses involving giving false information. I believe since it's a knowledge type instruction it's an honest and reasonable instruction." Neither counsel objected. The military judge's ruling covered Specifications 2, 7, and 10 of Charge IV, although the defense had only requested the instruction with regard to Specification 2.

## DISCUSSION

### I. Immunity Request

#### A. Standard of Review

■ We review the military judge's ruling on the defense motion to abate the proceedings for an abuse of discretion. *See United States v. Monroe*, 42 M.J. 398, 402 (1995). To prevail, the appellant must establish that he met the conditions for a grant of immunity to a defense witness as set forth in R.C.M. 704(e). *See United States v. Richter*, 51 M.J. 213, 223 (1999).

#### B. Failure to Process the Request

In attempting to show an abuse of discretion, the defense argues that the failure to process the request was a violation of the appellant's due process rights and that the failure to abate the proceedings until the request was processed foreclosed the appellant's right to present a defense.[7]

---

6. In the immunity request and during the Article 39(a), UCMJ, session, the defense asserted that PVT Rush had been promised leniency in exchange for his testimony. The government noted during the motions hearing that there was no leniency the government could grant him, as action had been taken on his sentence. As there is no evidence of any immunity or other *quid pro quo* for PVT Rush's testimony, we conclude that he testified without inducement of any sort.

7. We note that the timing of the defense request for abatement, coupled with the filing of the request for immunity and a request for a continuance on the same date, raises the suggestion that the request for immunity was made as an effort to delay the trial. The pretrial motions deadline set by the military judge in a February 1997

Article 39(a) session was 31 March 1997. The defense first raised the issue of immunity in pretrial correspondence in April 1997, yet did not file a formal request until the Friday before the trial was scheduled to begin. The timing of a request for immunity for defense witnesses is a factor some courts have considered relevant in ruling on the defense motion. *See, e.g., United States v. Shandell*, 800 F.2d 322, 324 (2d Cir. 1986); *United States v. Turkish*, 623 F.2d 769, 777–78 (2d Cir.1980). On the other hand, the initial request was made before trial on the merits began and the defense was extraordinarily persistent in the immunity request, renewing it during the post-trial process. Under these circumstances, we will presume that the motion was made in good faith and not in an attempt to bolster the requested delay in the commencement of the trial. The timing of the immunity

■ When the defense asks a convening authority to act on a matter within the convening authority's discretion under either the UCMJ or the *Manual for Courts–Martial,* the law expects the convening authority to act. Whether the request is one for deferment of confinement or forfeitures, expert assistance, or immunity, the accused has a right to *action.* There is, of course, no guarantee that the action taken will be the action the accused desires, but a timely decision by the convening authority is the process which an accused is due.[8] *See United States v. Pringle,* 19 U.S.C.M.A. 324, 41 C.M.R. 324, 326, 1970 WL 7338 (1970) (failure of convening authority to act on defense request raises questions as to his understanding of his quasi-judicial responsibilities). Military judges have the power to enforce this expectation; they can abate the proceedings or otherwise grant delays until the convening authority has been afforded the opportunity to make a decision. *Cf. United States v. McCants,* 39 M.J. 91, 94 (C.M.A.1994) (military judges are expected to exercise their authority when confronted with non-compliance with Rules for Courts–Martial).

■ We do not mean to imply that the government merely sat on this defense request for immunity. The record is clear that the trial counsel promptly contacted the attorneys for the individuals for whom immunity had been requested to confirm that the witnesses would invoke their rights against self-incrimination and to confirm, if possible, the defense proffer regarding their testimony. Recognizing that the convening authority had no authority to grant immunity, the chief of military justice contacted the local United States Attorney's office to ascertain the prosecuting attorney's position on the immunity request. What we cannot ascertain from the record is whether the convening authority was ever asked, prior to trial, to deny or forward the defense immunity request.[9]

■ Notwithstanding this failure to bring the request to the convening authority (or to document any oral discussions between the government representatives and the convening authority), the parties to the trial treated the request as denied. The defense asked that the proceedings be abated until the requested immunity was granted and interposed no objection to the military judge's ruling on the request without action by the convening authority. In the absence of plain error, a failure to object at trial generally waives appellate consideration of an issue.[10] *See* R.C.M. 905(e); *United States v. Briggs,* 42 M.J. 367, 370 (1995); *United States v. Fisher,* 21 M.J. 327 (C.M.A.1986); *United States v. Garren,* 49 M.J. 501, 505 (Army Ct.Crim.App.1998). Any error in the

---

request and the motion for appropriate relief, however, impact on our view of the government's failure to properly process the request.

8. We do not find the failure of the convening authority to act on the immunity request prior to the conclusion of the trial to be an error of constitutional dimensions. Rather, we base our due process conclusion on statutory or regulatory construction principles. *Cf. United States v. Gammons,* 51 M.J. 169, 181 (1999) (interpreting the due process holding in *United States v. Pierce,* 27 M.J. 367, 369 (C.M.A.1989), that placing a nonjudicial punishment record for the same offenses before a court-martial constitutes an error of statutory, not constitutional, dimensions).

9. In the appellate pleadings and during oral argument, the appellant contended that Army Regulation (AR) 27–10 and R.C.M. 704(c)(2) required that all requests for immunity involving persons not subject to the UCMJ be forwarded to the Attorney General in accordance with the procedures set forth in AR 27–10. We do not read either the regulation or the Rule as divesting the

general court-martial convening authority of the power to *deny* an immunity request without forwarding it. The Army regulation speaks in terms of *issuing* grants of immunity pursuant to 18 U.S.C. §§ 6001–6004, and requires forwarding a draft order to testify that includes a finding the testimony is necessary to the public interest. *See* Army Regulation 27–10, Legal Services: Military Justice, para. 2–4c (8 Aug. 1994). When a convening authority does not believe the requested immunity is necessary to the public interest, we see no logic in requiring him to forward a draft request asserting the contrary. *Cf. United States v. Bessard,* 1992 CMR Lexis 407, No. 28612 (A.F.C.M.R. 6 Apr. 1992) (while request for immunity was pending with Department of Justice, military judge nonetheless ruled proffered testimony did not warrant immunity).

10. Any error in failing to grant immunity would not be of constitutional dimensions, as there is no constitutional right to immunity under either a due process or right to present a defense analysis. *See Richter,* 51 M.J. at 223; *Turkish,* 623 F.2d at 777.

military judge's consideration of the immunity issue in the absence of action by the convening authority was thus waived, absent plain error.

■■■ To constitute plain error, the error must prejudice the substantial rights of the accused. *See* UCMJ art. 59(a), 10 U.S.C. § 859(a); *United States v. Powell,* 49 M.J. 460 (1998). While it may have been error for the military judge to act on a premature request to abate the proceedings, the error was neither plain, nor one that ultimately prejudiced the appellant. Substantively, if not procedurally, the military judge correctly ruled that the defense immunity request did not meet the strict requirements imposed by R.C.M. 704(e).

### C. Rule for Courts–Martial 704 Requirements

Rule for Courts–Martial 704(e) authorizes a military judge to direct "that either an appropriate convening authority grant testimonial immunity to a defense witness or, as to the affected charges and specifications, the proceedings against the accused be abated." Before issuing such an order, the military judge must find that: (1) the witness intends to invoke the right against self-incrimination; (2) the government has either engaged in discriminatory use of immunity to gain a tactical advantage or, through overreaching, has forced the witness to invoke the privilege; and (3) the witness' testimony is material, exculpatory, not cumulative, affects more than credibility of other witnesses, and is not obtainable from any other source.[11] *See* R.C.M. 704(e).

Rule for Courts–Martial 704(e) adopts the majority rule in other federal courts regarding defense requests to immunize witnesses. *See, e.g., Turkish,* 623 F.2d at 776–78. *See also Manual for Courts–Martial, United*

*States* (1995 ed.), app. 21, R.C.M. 704 analysis, at A21–38 [hereinafter MCM, 1995]. While it does not foreclose the possibility of an "immunize or abate" order with regard to a defense witness, it clearly places a very heavy burden on the defense, as the defense must meet each of the three requirements to obtain such an order. *See Richter,* 51 M.J. at 223.

### 1. The Witness Will Invoke the Privilege

The defense request for immunity cleared the first hurdle, as all of the witnesses indicated personally or through counsel, that if called, they would invoke their privilege against self-incrimination. These witnesses were entitled to claim the privilege, in as much as federal courts have indicated that a defendant awaiting sentencing after acceptance of his guilty plea retains the privilege against self-incrimination because any inculpatory testimony given could be used to enhance his sentence. *See United States v. Domenech,* 476 F.2d 1229, 1231 (2d Cir.), *cert. denied,* 414 U.S. 840, 94 S.Ct. 95, 38 L.Ed.2d 77 (1973). *See also United States v. Seavers,* 472 F.2d 607 (6th Cir.1973) (possible state prosecution after guilty plea in federal court sufficient to invoke self-incrimination claim).

### 2. Establishing Discriminatory Use or Government Overreaching

In conclusory terms, the defense argued that the government had used immunity grants to its tactical advantage by granting immunity to PFC Murray and denying it to the defense. In an attempt to show government overreaching, the defense argued that the government had scheduled the appellant's trial before the sentencing of the civilian defendants. Neither claim was sufficient to meet the second requirement of R.C.M. 704(e).

---

**11.** The version of R.C.M. 704 in effect at the time of the appellant's trial was adopted in 1993, replacing a version that had reflected the minority view in the federal courts. In *Monroe,* the Court of Appeals for the Armed Forces discussed the various approaches to defense immunity that have been applied in the military courts. 42 M.J. at 401–02. We comment on the changed standard only because many military cases treating the subject of defense immunity requests were decided based on the earlier R.C.M. 704, which required the testimony to be "of central importance to the defense case [such] that it is essential to a fair trial." MCM, 1984, R.C.M. 704(e)(1). *See, e.g., United States v. Zayas,* 24 M.J. 132 (C.M.A.1987), *vacated in part,* 26 M.J. 203 (C.M.A.1988). The 1984 version of R.C.M. 704(e) clearly imposed a lighter burden on the defense than does the current version.

The appellant has failed to establish that the government engaged in discriminatory use of immunity in order to gain a tactical advantage. Nothing in R.C.M. 704(e) requires a convening authority who grants immunity to a prosecution witness to similarly immunize a defense witness. While "discriminatory use of immunity" is not defined in the rule, we are confident that the refusal to grant immunity to a defense witness targeted for or pending prosecution, without something more, does not constitute it. *See Richter*, 51 M.J. at 222. *See also Blissett v. Lefevre*, 924 F.2d 434, 442 (2d Cir.), *cert. denied*, 502 U.S. 852, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991) (denial of immunity to defense witnesses while granting immunity to prosecution witnesses not unfair); *Shandell*, 800 F.2d at 324 (where witness is a prosecution target no discrimination or overreaching exists in failure to grant immunity); *Turkish*, 623 F.2d at 778 (urging summary rejection of defense immunity requests when witness is target of prosecution). *But see United States v. Young*, 86 F.3d 944, 948 (9th Cir.1996) (denial of immunity to defense witness who would directly contradict immunized government witness' testimony might warrant finding of deliberate distortion of fact-finding process). We note that the only government witness in this case testifying under a grant of immunity was PFC Murray, who was declared a hostile witness for the government. If selectively granting immunity only to witnesses for the prosecution could ever establish discriminatory use, this case certainly does not present that issue.

Turning to the governmental "overreaching" aspect of the second hurdle the defense must surmount, we likewise conclude that the defense has failed to clear the bar.

During an Article 39(a), UCMJ, session held on 28 February 1997, the defense asked for and received, over government objections, a trial date of 13 May 1997. Trial on the merits actually began on 14 May 1997. The record is devoid of any evidence that the military authorities colluded with the civilian authorities to delay sentencing of the civilian defendants so as to preclude their testifying for the appellant. *See United States v. Bahadar*, 954 F.2d 821, 824 (2d Cir.1992) (deliberately delaying sentencing of witness might constitute overreaching); *Domenech*, 476 F.2d at 1231 (in absence of proof government manipulated trial date, no overreaching). We are unaware of any authority for the proposition that the government had an obligation to delay the appellant's trial until after his civilian witnesses were sentenced. Parenthetically, we note that such a delay would not, apparently, have produced witnesses willing to testify without immunity, as the defense renewed its request for immunity after all of the witnesses were sentenced.[12]

### 3. *Specificity of the Proffer*

We also conclude that the appellant has failed to meet the third requirement of R.C.M. 704(e). With regard to the immunity request for James Ivey, Deon McFadden, and Doug Parrett, the defense proffers of expected testimony fail to establish that the witnesses' testimony would be material and exculpatory. Statements that the witness will testify to a legal conclusion—that the appellant was not a party to a particular conspiracy—are insufficient. The proffer of expected testimony must set forth the specifics of the witness' testimony. These proffers did not provide sufficient detail for the reviewing judge to determine if the testimony was material, exculpatory, and not cumulative. *See United States v. Alston*, 33 M.J. 370, 374–75 (C.M.A.1991) (defense proffer lacked specifics that would be exculpatory); *United States v. James*, 22 M.J. 929, 933 (N.M.C.M.R.1986) ("clearly exculpatory" defined as evidence that clearly negates guilt).

---

12. Having perused the defense R.C.M. 1105 and 1106 submissions, a reason for the witnesses to continue to refuse to testify without immunity becomes apparent. In each of the stipulations pursuant to their guilty pleas, the defendants implicate the appellant in one or both of the drug conspiracies charged. Should their non-immunized testimony in a subsequent trial contradict the guilty plea stipulations, the defendants could face additional federal charges for making false statements. *See Bahadar*, 954 F.2d at 825 (federal law permits prosecution if trial testimony of witness is contrary to prior statements to law enforcement personnel). With immunity, however, they could testify in the appellant's favor even though such testimony could directly contradict the facts upon which their plea bargains were based.

*See also Burns,* 684 F.2d at 1078 (witnesses' refusal to make a proffer of testimony justified court's denial of immunity). The proffer that Frank McFadden would testify that he was the owner of the rifle in Specification 3 of Charge II is, however, sufficiently specific; the problem with this proffer is that it does not come from the witness, but rather from unnamed "other sources." Without more information, a trial judge would be hardpressed to determine the reliability of these sources in predicting what Frank McFadden might really say under a grant of immunity.[13] *See United States v. Herbst,* 641 F.2d 1161, 1168–69 (5th Cir.), *cert. denied sub. nom. Griffin v. United States,* 454 U.S. 851, 102 S.Ct. 292, 70 L.Ed.2d 141 (1981).

We are fully satisfied that this trial was not tainted by any evidence of prosecutorial misconduct or overreaching that would warrant issuing an abatement order. *See Monroe,* 42 M.J. at 402–03. The military judge did not abuse his discretion in finding no substantive merit to the defense request to abate the proceedings.

## II. Legal and Factual Sufficiency of the Firearms Purchases

The appellant argues that his convictions of the three specifications alleging that he was a "straw purchaser" of firearms are legally and factually insufficient because the government failed to prove that the appellant knew he was not the actual buyer.

### A. Standard of Review

The test for legal sufficiency, is whether, viewing the evidence in a light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). On the other hand, when testing for factual sufficien-

cy, this court must, after weighing the evidence and making allowances for not having seen the witnesses in person, be convinced that an accused is guilty beyond a reasonable doubt. *United States v. Turner,* 25 M.J. 324 (C.M.A.1987); *United States v. Duncan,* 34 M.J. 1232, 1246 (A.C.M.R.1992).

### B. Elements of the Offenses

Section 922(a)(6) of Title 18, United States Code, provides that it shall be unlawful:

> for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter.

Counsel for both sides agreed that the offenses under this statute alleged in Specifications 2, 7, and 10 of Charge IV had four elements: (1) that on the dates alleged, the appellant gave written statements to Dragon Arms, Incorporated, that he was the actual purchaser of the firearms alleged in the specifications; (2) that, at the time he made the statements, the appellant knew they were false, in that he knew he was purchasing the firearms for others; (3) that the statements were intended to or likely to deceive the dealer with respect to a fact material to the sale—that he was the actual purchaser; and (4) that the appellant's conduct was, under the circumstances, prejudicial to good order and discipline in the Army or of a nature to bring discredit upon the Army.[14]

---

13. The appellant was charged with a failure to register this rifle under the provisions of a Fort Carson regulation. The mere fact that someone else who was not subject to Article 92, UCMJ, 10 U.S.C. § 892, owned the rifle and stored it in appellant's off-post home or automobile would not incriminate the owner, unless, of course, the rifle constituted evidence of some other crime. The appellant has the burden of meeting each of the three prongs of R.C.M. 704(e), including this one.

14. The fourth element was not required for a conviction of violating a federal statute. A violation of a federal criminal statute is a violation of clause 3 of Article 134, UCMJ, 10 U.S.C. § 934, as a crime or offense not capital. It is not necessary to plead and prove that such conduct is either service discrediting or prejudicial to good order and discipline. MCM, 1995, Part IV, para. 60b.

The written statements referenced in the specifications consisted of the appellant's answers to questions on ATF Forms 4473. There is no question that the appellant signed the ATF Forms 4473 (Prosecution Exhibits 24, 26, and 29) asserting that he was the actual purchaser of the firearms alleged in each of the three specifications. There is likewise no question that the forms were signed and presented to facilitate the purchase of the firearms from a licensed firearms dealer.

## C. The Nature of the Appellant's Challenge

■ The facts adduced at trial, including the appellant's handwritten confession, clearly established that he purchased the firearms for others who were ineligible by virtue of the age or residence requirements to make the purchases themselves. The McFadden brothers and Doug Parrett were not Colorado residents, and on 13 March 1996, Darryl Washington was underage. The appellant's argument before this court, as at trial, however, focuses not on his knowledge of the facts, but on his knowledge of the law. He argues that he did not understand what was meant by the term "actual buyer." He contends that he was affirmatively misled by Mr. Bernstein's advice that the appellant could purchase firearms and could, immediately upon leaving the store, resell them to others.[15] We focus, at least initially, on the 12 March 1996 firearms purchases, for the facts of this sale most strongly support the appellant's theory.

### 1. "Actual Buyer" and Scienter Requirement

Discerning the exact nature of the appellant's legal and factual sufficiency challenge is difficult. In his appellate pleadings, he asserts that he did not "knowingly" make a false statement on the ATF Forms 4473 because Mr. Bernstein misled him about what being the "actual buyer" meant. The appellant is forced to challenge the scienter requirement as it relates to being the "actual buyer," because his own confession, as well as numerous other facts adduced at trial, established that he knew that he was purchasing the firearms for others.

The appellant's position has a certain appeal, for it is clear that Mr. Bernstein knew or should have known on 12 March 1996 that the appellant was not buying the firearms for himself. Mr. Bernstein described the length of time the appellant and his friends spent in the store and in test-firing the weapons. He also admitted that when the purchases were made, the friends produced the money, either handing it to the appellant or placing it on the counter. Mr. Bernstein also admitted knowing the friends were from out-of-state and thus could not lawfully purchase the weapons themselves. Finally, he offered the appellant advice on how to resell the firearms and remove the registration from his name. We note that firearms dealers have lost their federal firearms licenses for similar conduct. See 18 U.S.C. § 922(b); Perri v. Department of the Treasury, 637 F.2d 1332, 1334–35 (9th Cir.1981) (dealer's license revoked because he had reasonable cause to believe that transaction was a straw purchase).

The problem with the appellant's interpretation of the scienter requirement of 18 U.S.C. § 922(a)(6) is that it is not one recognized by any federal court that has interpreted this statute. At best, his argument parallels the "entrapment by estoppel" defense recognized in United States v. Howell, 37 F.3d 1197 (7th Cir.1994). At worst, it becomes a defense based on ignorance of the law.

Ignorance of the law is, generally speaking, not a defense. See R.C.M. 916(l)(1). Effectively, the appellant is saying: "Because I was ignorant of what 'actual buyer' meant, I cannot be held criminally liable for my actions."

Our restatement of the appellant's argument should not be construed as agreement with the factual basis for the position assert-

---

15. Mr. Bernstein testified that he informed the appellant that the appellant could transfer the firearms to another individual simply by getting a bill of sale, and could remove the registration from his name to that of the purchaser by mak-ing appropriate entries on the registration form. Mr. Bernstein also testified that it was legal to buy a gun from him and transfer it to someone else immediately upon leaving the store.

ed. There was ample circumstantial evidence that the appellant understood what "actual buyer" meant, not the least of which were the efforts he and Mr. Bernstein employed to avoid directly confronting the issue. The friends were ineligible purchasers; the friends test-fired the weapons; the friends provided the money; and the friends took possession of the firearms. The appellant's tap dance with Mr. Bernstein around the issue leads inescapably to the conclusion that the appellant said and signed what was necessary to complete the purchase, but scrupulously avoided making any suggestion that he was actually buying the firearms for others, because he knew that doing so would stop the sale.

Courts have considered similar ignorance arguments in drug offenses. One who possesses an illegal drug, honestly believing it to be powdered sugar, cannot be convicted of possession of the drug, because possession must be knowing possession. *See United States v. Mance,* 26 M.J. 244, 249–50 (C.M.A. 1988). Likewise, someone cannot be convicted of possessing a drug unless he knew of its presence. *Id.* In this case, however, the appellant knew he was purchasing firearms, and knew that he was doing so for others who were unable, by virtue of their residence, to make the purchases on their own behalf. *See Cody v. United States,* 460 F.2d 34, 38 (8th Cir.1972) (question in an 18 U.S.C. § 922(a)(6) case is whether the defendant "understood the facts, not the law"). His position is akin to that of the individual who possesses an illegal drug, knowing of the drug's presence and composition, but who argues that he did not know the drug was on the federal controlled substances schedule. *See Mance,* 26 M.J. at 249. The lack of knowledge may be a mitigating factor in sentencing, because an individual who possesses a drug without knowing its illegal nature may be less culpable than one who possesses it knowing it to be illegal, but both are guilty of drug possession.

Weapons, like drugs, are pervasively regulated. *See United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971).

*Cf. United States v. Currier,* 621 F.2d 7, 10 (1st Cir.1980) ("Congress will not be presumed to have required specific intent as an element of the crime where the purpose of the statute is the regulation of dangerous objects such as firearms"; dealer convicted of selling firearms without proper completion of ATF Form 4473). *See also United States v. International Minerals & Chemical Corp.,* 402 U.S. 558, 562, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971) (use of "knowingly" in a criminal statute aimed at regulation of dangerous objects does not mean that a specific intent to violate the law is required). The scienter element of this statute is knowledge that the appellant was purchasing firearms for another, not knowledge that his conduct violated the law. *See United States v. Beebe,* 467 F.2d 222, 226 (10th Cir.1972); *Cody,* 460 F.2d at 38.

 Other federal courts have broadly construed the requirement for knowingly making a false statement on a federal firearms application. The "knowing" requirement embraces a reckless disregard for the truth, as well as actual knowledge of the statement's falsity. *See United States v. Hester,* 880 F.2d 799, 802 (4th Cir.1989). The government need not show affirmative criminal intent on the part of the accused in order to establish a violation of 18 U.S.C. § 922(a)(6). *See United States v. Behenna,* 552 F.2d 573, 575 (4th Cir.1977). Failing to accurately complete the documents required for purchase of the firearm, with the general intention of deceiving the dealer, may be sufficient to show a violation. *See, e.g., United States v. Harrelson,* 705 F.2d 733, 736 (5th Cir.1983), and cases cited therein.

 Clearly, the appellant was purchasing firearms for others who were ineligible to make the purchases on their own behalf. That is the essence of a "straw purchase." *See United States v. Polk,* 118 F.3d 286, 295 (5th Cir.1997). A knowing violation of the law is not required, only the knowing making of a false statement. *See United States v. Cornett,* 484 F.2d 1365, 1368 (6th Cir.1973).[16]

**16.** In *Cornett,* the trial judge refused to permit the defendant to testify that he did not know

federal law prohibited his purchase of a firearm. 484 F.2d at 1368.

### 2. Redefinition of "Actual Buyer"

Alternatively, we could construe the appellant's argument as subtly different from the cases interpreting the scienter requirement of 18 U.S.C. § 922(a)(6) discussed above. The appellant may be arguing that his statement that he was the actual purchaser was true because he understood "actual buyer" to mean the one who completed the forms. However, such an argument is specious; the appellant is not Humpty Dumpty and this court is not Wonderland.[17] That position would, effectively, make a mistake of law—a mistake about the legal definition of "actual buyer"—a defense. We are confident that that is not what the Congress intended in prohibiting straw purchasers from circumventing other restrictions on firearms purchases.

### 3. Entrapment by Estoppel

Although not well articulated, the appellant also raises the defense of "mistake" in yet a third context, that of reliance on the pronouncement of an authorized official. See R.C.M. 916(l)(1) discussion. At trial, the appellant requested an entrapment instruction for all three 18 U.S.C. § 922(a)(6) offenses. The military judge gave an entrapment instruction only with regard to Specification 7 of Charge IV, the purchase that the appellant made on 13 March 1996, on behalf of Darryl Washington. At the time of the purchase, Darryl Washington was an informant for the ATF, and the purchase was one made with federal funds.

The "mistake" defense the appellant now raises is broader than the standard entrapment defense, however, and is closely analogous to the defense of entrapment by estoppel, recognized by at least one federal circuit as a possible defense to an 18 U.S.C. § 922(a)(6) violation. See Howell, 37 F.3d at 1203–06. The discussion to R.C.M. 916(l)(1) suggests, without using that terminology, that "entrapment by estoppel" may be a defense in trials by courts-martial.

The defendant in Howell was the wife of a felon. Like the appellant in this case, she purchased a revolver and completed the ATF Form 4473 asserting that she was the "actual buyer" of the weapon. The revolver was later found in the possession of her husband. Charged with a violation of 18 U.S.C. § 922(a)(6), Mrs. Howell defended on the grounds that she considered herself the actual purchaser and that the dealer validated her belief when he sold her the weapon, knowing that the ultimate recipient would be her husband. The gravamen of the appellant's argument is similar: Mr. Bernstein's conduct—completing the transaction under circumstances indicating that the ultimate recipient was someone other than the appellant—led the appellant to the mistaken belief that his purchase was legal.

Mrs. Howell's argument was unsuccessful, however. While holding that an "entrapment by estoppel" defense exists when a government official assures a defendant that certain conduct is legal and the defendant reasonably relies on the official's pronouncements, the Court of Appeals for the Seventh Circuit nonetheless affirmed Mrs. Howell's conviction. See Howell, 37 F.3d at 1204–06. The Seventh Circuit joined several others in finding that a federally licensed firearms dealer was not a "government official" for purposes of this defense. The court also relied on Mrs. Howell's less-than-complete disclosures to the firearms dealers, as she never informed the dealer that her husband was a felon prohibited from making a firearms purchase in his own right. Id. at 1205.

We find a number of parallels between the Howell case and that of the appellant. We find the appellant's disclosures to the dealer less than complete. Had the appellant asked Mr. Bernstein if he could make a purchase on behalf of his out-of-state friends, and received assurances that he could do so, we would find this a far closer issue. The "ask me no questions and I'll tell you no lies" approach here, however (by both Mr. Bernstein and the appellant), is consistent with a criminal state of mind. The appellant was not simply an innocent purchaser, led astray by a fast-talking gun salesman, nor was he

---

**17.** " 'When *I* use a word,' Humpty Dumpty said, in a rather scornful tone, 'it means just what I choose it to mean—neither more nor less.' "

Lewis Carroll, *Through the Looking Glass, quoted in* John Bartlett, *Familiar Quotations* 613 (15th ed.1980).

misinformed as to the law by one upon whom he had a right to rely. *Cf. United States v. Tallmadge*, 829 F.2d 767 (9th Cir.1987).

### D. Intent to Deceive

■ There is, however, one other element of 18 U.S.C. § 922(a)(6) that we find problematic in the appellant's case. In order to violate the statute, the false statements must be "intended or likely to deceive" the dealer into believing the firearms purchase is lawful. Under the facts and circumstances of this case, we do not find that the appellant's statements on 12 March 1996 were intended to or likely to deceive Mr. Bernstein. On the contrary, we are quite satisfied that Mr. Bernstein knew exactly what was going on: that the appellant was purchasing firearms for his friends who were ineligible to do so in their own right. Further, we are satisfied that the appellant knew that Mr. Bernstein understood exactly what was going on. While Mr. Bernstein never asked whom the ultimate recipients of the firearms would be, his policy of deliberate ignorance was calculated to make the sale, and skirt the very edge of the law, without jeopardizing Dragon Arms' firearms license. Accordingly, exercising our Article 66, UCMJ, powers, we find that the appellant's conviction of Specification 2 of Charge IV is factually insufficient.

We do not find, however, that the remaining two false statement offenses (Specifications 7 and 10 of Charge IV) suffer from the same infirmity. With regard to the 13 March 1996 offense, the appellant made the purchase from ATF Special Agent Thomasson, who was posing as a store employee, not Mr. Bernstein. Special Agent Thomasson never indicated that the purchase would be lawful and that subsequent transfer was permitted, so we find adequate evidence of the appellant's intent to deceive the dealer about the identity of the actual purchaser. Further, we find that the appellant's representations and conduct were likely to deceive an innocent or law-abiding firearms dealer. The situation with regard to the 8 April 1996 purchases is even clearer. When Ms. Flannel attempted to warn the appellant about making straw purchases and cautioned him about gang involvement, he lied to her, say-

ing he was not a gang member. This, coupled with the other facts and circumstances of the transaction, is adequate evidence that the appellant's false statement on the ATF Form 4473 was intended to deceive the dealer.

We find ample evidence, legally and factually of the appellant's guilt of Specifications 7 and 10 of Charge IV.

### III. Instructional Error

#### A. Standard of Review

■ We must also address, however, the impact of what the appellant claims were erroneous and prejudicial instructions to the court members on the remaining 18 U.S.C. § 922(a)(6) firearms purchase offenses. A military judge "has substantial discretionary power in deciding on the instructions to give." *United States v. Damatta–Olivera*, 37 M.J. 474, 478 (C.M.A.1993) (citations omitted). We review the military judge's decision to give an instruction for abuse of discretion and the correctness of instructions actually given de novo. *See United States v. Maxwell*, 45 M.J. 406, 424–25 (1996).

#### B. The Challenged Instruction

The appellant challenges the following instruction:

The evidence has raised the issue of ignorance or mistake of fact on the part of the accused concerning whether he had to give accurate information to the gun dealers in acquiring these weapons. You remember this—there's some evidence that the accused—that Mr. Bernstein may have told the accused that once he had purchased the weapon, and once he left the store he could sell the weapon to somebody else. I advised you earlier that to find the accused guilty of this offense you must find beyond a reasonable doubt that he knowingly gave false information knowing that it could mislead the dealer.

If the accused, at the time of the offense, is ignorant of the fact that he had to give truthful information in this regard, or under the mistaken belief that because he could later sell the weapon he did not have to actually tell the dealer—I'm sorry. That he did not have to tell the dealer

accurate information concerning the purchaser, then he cannot be found guilty of the offenses that deal with this information concerning providing false information in the acquisition of weapons.

The ignorance or mistake no matter how unreasonable it might have been is a defense. Now in deciding whether Sergeant Ivey was ignorant of this fact or under the mistaken belief that he did not have to give complete accurate information with regard to the purchase of these weapons, you should consider the probability or improbability of the evidence presented on the matter. You should consider the accused's age, education, and experience along with all the other evidence you've heard on this issue. The burden is on the government to establish the guilt of Sergeant Ivey. If you are convinced beyond a reasonable doubt that at the time of the alleged offenses Sergeant Ivey was not ignorant of the fact that he had to provide truthful information in relation to the purchase of these weapons, *or if he's under the mistaken belief that he did not have to give complete accurate information—truthful information, then the defense of ignorance does not exist.*

Are there any questions about that instruction?

(Emphasis added).

### C. Errors in the Instruction

In this instruction, the military judge first told the court members that if the appellant honestly believed he did not have to tell the dealer the truth about the actual weapons purchasers, then he could not be found guilty. He then restated the instruction and advised the members that if the appellant was under the mistaken belief that he did not have to give truthful information, the defense of ignorance did not exist. It is the latter instruction of which the appellant now complains.

Both statements of the law were erroneous. The first was wrong because an honest belief that the appellant could lie to or give less than accurate information to the dealer constituted an instruction based on mistake of law, which is not a defense. In this re-

spect, the defense received a favorable instruction to which it was not entitled. The defense is entitled to accurate instructions, but is not entitled to have the court members instructed on a defense that does not exist. *See United States v. Poole,* 47 M.J. 17 (1997) (judge not required to give a requested instruction that misstates the law).

With regard to the second error, the military judge juxtaposed two clauses, and ended up with a negative that did not belong in the instruction. Mistake of fact is a defense to a crime involving a knowledge element. *See* R.C.M. 916(j). Insofar as the instruction stated that the defense did not exist if the members were convinced that the appellant was not ignorant, the instruction was correct, if convoluted. When, however, the judge attempted to add that the appellant's honest, but mistaken, belief that he did not have to give truthful information to the dealer was a defense, he said just the opposite.

We conclude that, under these facts, the appellant cannot be prejudiced by an erroneous instruction to which he was not entitled; and he likewise cannot be prejudiced by an accurate instruction—that ignorance is not a defense—albeit one given in an apparent misstatement by the military judge. We recognize that confusing instructions may give rise to a finding of prejudicial error, *see United States v. Curry,* 38 M.J. 77 (C.M.A. 1993), but do not find that the appellant was prejudiced in this case. Any confusion surrounding the ignorance instruction actually given could only inure to the appellant's benefit, as the instruction, taken as a whole, implied that honest ignorance was a defense.

### D. Failure to Instruct on Mistake of Fact

The appellant would have been entitled to an instruction on mistake of fact, if ignorance or lack of knowledge were reasonably raised by the evidence, because the offense charged had a knowledge element. *See* R.C.M. 916(j). A mistake of fact or ignorance instruction, however, would be needed only to explain the requirement for actual knowledge of whom the intended recipients of the weapons were, not what the appellant believed the law to be. Thus, if the appellant honestly believed he was buying the weapons for him-

self, the defense of ignorance or mistake of fact would exist, in spite of the fact that the weapons were later recovered from the possession of his co-conspirators. There was, however, no evidence that the appellant believed he was buying the weapons for himself.

The military judge correctly instructed the court members that, at the times the appellant signed the ATF Forms 4473, stating that he was the actual purchaser of the firearms, he had to know that those statements were false. While the military judge did not explain how mistake or ignorance might constitute a defense, his failure to do so was based on a lack of evidence raising that issue. The appellant's knowledge that he was purchasing the firearms for another was simply not in issue during the trial. He acknowledged doing so in his confession to ATF agents and in the audiotape of his conversation with Darryl Washington. It was his *belief* that he could do so *lawfully* that he tried to portray as a defense.

### E. Waiver

In any event, we believe that the appellant waived any error in the instructions both by his failure to object to them at trial and by his failure to request an instruction as to all the 18 U.S.C. § 922(a)(6) offenses. *See* R.C.M. 920(f). His civilian defense counsel asked for an ignorance instruction only as to Specification 2 of Charge IV, and did not propose any particular language for the instruction requested. The military judge gave an ignorance instruction for all three 18 U.S.C. § 922(a)(6) offenses and provided counsel with the opportunity to object to any of the instructions given. While the civilian defense counsel objected to the entrapment instruction as not covering all the firearms purchase offenses, he interposed no objection at all to the ignorance or mistake instruction.

■ The general rule is that a failure to object to an instruction before the members close to deliberate constitutes waiver of the issue, in the absence of plain error. *See* R.C.M. 920(f); *United States v. Smith*, 50 M.J. 451, 455 (1999). Merely requesting an instruction is ordinarily not sufficient to preserve the claim of error. *See Maxwell*, 45 M.J. at 426.

The policy reasons behind this waiver rule are amply illustrated here. When giving lengthy, convoluted instructions on defenses such as ignorance or mistake, it is necessary to ensure that court members understand that the burden of proof is not shifted to the defense. Thus, many instructions include what are, in essence, double negatives, e.g., "If you are convinced beyond a reasonable doubt that at the time of the alleged offenses, X was not ignorant of fact Y, then the defense does not exist." It is relatively easy to insert an additional negative or omit one of the negatives. Prompt objection by the aggrieved party, and equally prompt correction by the military judge, permits the members to receive accurate instructions.

### F. Plain Error Analysis

■ We do not find plain error under the facts of this case. "To establish plain error, appellant must demonstrate that there was error, that the error was obvious and substantial, and that the error materially prejudiced his substantial rights." *Smith*, 50 M.J at 456 (citation omitted). While we have concluded that the instructions given were erroneous, we do not find that the appellant was materially prejudiced thereby. *See* UCMJ art. 59(a); *Powell*, 49 M.J. at 464. Taken as a whole, the instructions gave the appellant the benefit of a defense that did not exist in law, and applied that defense to all three specifications alleging straw purchases of firearms when the defense requested the mistake instruction only with regard to Specification 2 of Charge IV. The instructions adequately apprised the court members that the appellant's statement that he was the actual buyer of the weapons had to be knowingly made.

### IV. Sentence Appropriateness

Pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), the appellant asks us to consider that his sentence to fifteen years confinement is "wholly inconsistent" with the sentences of his co-conspirators. We note that the appellant's co-conspirators each pled guilty to only one drug-related conspiracy and, in exchange for their guilty pleas, had other charges dismissed. We find that the

appellant received individualized consideration on the basis of the offenses of which he was convicted and his prior clean military record. *See United States v. Aurich,* 31 M.J. 95, 96–97 n. * (C.M.A.1990) (Cox and Everett, J.J., concurring).

The finding of guilty of Specification 2 of Charge IV is set aside and Specification 2 of Charge IV is dismissed. The remaining findings of guilty are affirmed. Reassessing the adjudged sentence on the basis of the error noted, the principles of *United States v. Sales,* 22 M.J. 305 (C.M.A.1986), and the entire record, the court affirms the sentence.

Senior Judge CAIRNS and Judge BROWN concur.